UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| IN RE: | * | CHAPTER 11 |
| | * | |
| ZEUS INVESTMENTS, LLC | * | CASE NO. 11-50406 |
| | * | |
| DEBTOR. | * | |
| | * | |

**EMERGENCY MOTION FOR ENTRY OF ORDER PURSUANT TO SECTIONS 361 AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 4001 FOR INTERIM AND FINAL ORDERS: (1) AUTHORIZING USE OF CASH COLLATERAL; (2) GRANTING ADEQUATE PROTECTION; (3) AUTHORIZING THE WORKING CAPITAL LOAN; (4) SCHEDULING AND APPROVING THE FORM AND METHOD OF NOTICE FOR A FINAL ORDER; AND (5) FOR RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The above-captioned debtor and debtor in possession (the "Debtor"), by and through its undersigned attorneys, hereby moves (this "Motion") this Court for entry of an order pursuant to sections 361 and 363 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, as amended, the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), in substantially the form attached hereto as Exhibit A: (1) authorizing the Debtor to use cash collateral; (2) granting adequate protection; (3) authorizing the Debtor to enter into the Working Capital Loan (defined below); (4) scheduling and approving the form and method of notice of the final hearing on the Motion; and (5) for other related relief as necessary. In further support of this Motion, the Debtor respectfully states as follows:

**JURISDICTION**

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. The statutory bases for the relief requested herein are sections 361 and 363 of the Bankruptcy Code and Rule 4001 of the Bankruptcy Rules.

## BACKGROUND

3. On this date (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, the "Bankruptcy Code"). No creditors committee has yet been appointed in this case by the United States Trustee. The Debtor is continuing in possession of its property and is operating its business in the ordinary course as debtor in possession.

**A.    The Debtor's History and Operations**

4. The Debtor, a Louisiana limited liability company, was formed in December 2005. The Debtor's members are as follows: Audrey Le (46.25% membership interest), Thanh Chau (36.25% membership interest), and Ronmar Management, Inc. (17.50% membership interest).

5. The Debtor owns and operates the Crown Plaza Lafayette located at 1801 W. Pinhook Road, Lafayette, Louisiana 70508 (the "Property" or "Hotel"). The Debtor purchased the Hotel on January 2, 2006. At the time of the purchase, the Hotel was operating as a Best Western, and the Debtor continued to operate the Hotel as a Best Western for approximately one and half years. The Debtor then operated the Hotel as Hotel Acadiana until April 2009.

6. While the Debtor operated the Hotel as Hotel Acadiana, it performed extensive renovations totaling $10 million in order to qualify to convert the Hotel into a Crown Plaza. Upon completion of the renovations in April 2009, the Debtor entered into a franchise agreement with International Hotel Group ("IHG"), Crown Plaza's parent company, to allow the Hotel to become a Crowne Plaza.

7. The Property features 290 guest rooms and over 14,000 square feet of flexible

meeting space. Each guest room features a new 32" flat panel television, wireless high speed Internet access, and comfortable furnishings. The Hotel has a beautifully landscaped outdoor pool, a health club quality fitness center, and a well appointed business center. The Hotel is positioned to be the full service leader in the Lafayette hotel community.

8. The Hotel participates in a frequent guest program sponsored by IHG, called the Priority Club. The Priority Club is the leading frequent guest rewards program in the hotel industry, with over 40 million members. Guests who are members of the Priority Club program are eligible to receive airline miles, room nights, or gifts as a reward for their loyalty and frequent use of the IHG family of brands. Historically, the Hotel has not taken full advantage of this program; however, the Hotel has now fully embraced this valuable selling tool and expects Priority Club members to have a positive impact on the Hotel's revenues in 2011.

9. In July 2010, the Debtor entered into a management agreement with Hospitality Management Corporation ("HMC"). Currently, HMC manages and operates the Property for the Debtor. Since HMC's arrival, several initiatives have begun to improve the Debtor's operating results, including dedicated training using HMC's front office training program, a service incentive program that rewards staff for the proper results, and a new guest room inspection process.

**B.     The Debtor's Capital Structure**

10. On August 23, 2006, St. Martin Bank & Trust Company ("St. Martin" or "Secured Lender"), as lender, loaned the Debtor $6,030,302.00 ("First Loan"). The indebtedness of the Debtor to St. Martin and all future extensions of credit are secured by, *inter alia*, a security interest in a collateral mortgage note in the amount of $10 million, which in turn was secured by

{00312275-11}                                         3

11-50406 - #6  File 03/24/11  Enter 03/24/11 16:49:29  Main Document  Pg 3 of 17

a Collateral Mortgage and Assignment of Leases and Rents dated August 23, 2006 ("First Collateral Mortgage"). The First Collateral Mortgage bears against the Property.

11. On February 27, 2008, St. Martin loaned the Debtor an additional $6,973,981.32 ("Second Loan"). The indebtedness of the Debtor to St. Martin was secured by, *inter alia*, the First Collateral Mortgage described in paragraph 10 above and a security interest in a collateral mortgage note in the amount of $15 million, which in turn was secured by a Collateral Mortgage and Assignment of Leases and Rents dated February 27, 2008 ("Second Collateral Mortgage"). The Second Collateral Mortgage bears against the Property.

12. On May 5, 2010, St. Martin consolidated the First Loan and the Second Loan, whereby the Debtor executed a Promissory Note dated May 5, 2010 totaling $12,178,170 (the "Loan"). The Loan is secured by, *inter alia*, a security interest in the two previous collateral mortgage notes and in turn, the First Collateral Mortgage and Second Collateral Mortgage. The Debtor, among other things, also executed a (i) Commercial Security Agreement, granting the Secured Lender a security interest in all of its fixtures, equipments, inventory, accounts and franchise rights, (ii) Commercial Pledge Agreement, pledging the previously executed Assignment of Leases and Rents, and (iii) Commercial Security Agreement, granting the Secured Lender a security interest in its claim against British Petroleum related to the oil spill in the Gulf of Mexico. As of the Petition Date, the Debtor owes approximately $12,830,822.43 on the Loan.

13. On July 28, 2009, Ronmar Management, LLC ("Ronmar") loaned the Debtor $1 million ("Ronmar Loan") and Ronald Kole loaned the Debtor $200,000 ("Kole Loan"). As security for the Ronmar Loan and the Kole Loan, Thanh Chau and Audrey Le each executed a Pledge Agreement pledging 100% of their membership interests in the Debtor. Among other things, the Pledge Agreement provides that in the event the Debtor does not make a payment on

the Ronmar Loan or Kole Loan, Ronmar and Ronald Kole have the ability to cancel the voting interests of the other members of the Debtor. Ronmar and Ronald Kole have not exercised rights to cancel the voting rights of the other members as of the Petition Date. As additional security for the Ronmar Loan and Kole Loan, the Debtor also executed a Multiple Indebtedness Mortgage in favor of Ronmar and Ronald Kole which bears against the Property.

14. Additionally, the Debtor has approximately $4 million in alleged debt owed to suppliers, contractors and materialmen for recorded liens and judgments related to the renovations performed in April 2009. Many of these claims (and liens) are disputed. The Debtor also owes approximately $420,000 in prepetition taxes, and approximately $3.4 million to trade and other unsecured creditors, including approximately $3.0 million owed for unsecured loans made by members of the Debtor and their relatives.[1]

### C. The Debtor's Decision to Seek Bankruptcy Relief

15. As of May 2010, the Debtor failed to make payments due under the Loan, triggering a default of the Loan. Several factors led to the Debtor's inability to pay the Loan. First, the renovations performed on the Hotel were projected to take approximately 8-9 months and to cost the Debtor approximately $7 million. Unfortunately, the Debtor had to replace its first two general contractors, who failed to pay numerous subcontractors, who in turn filed numerous liens and obtained judgments against the Debtor, resulting in the renovations taking 13 months and costing the Debtor $10 million, much more than anticipated. Secondly, the recession contributed to the Debtor's failure to pay the Loan. The Debtor began operations as a Crown

---

[1] The Debtor is also a party to several executory contracts and unexpired leases. The Debtor has rented a generator for $500 per month from Site Rental & Supply, LLC ("Site Rental"). Ronald Kole is a 50% equity owner of Site Rental and also the 100% equity owner of Ronmar, the holder of 17.5% membership interests in the Debtor and a lender to the Debtor. Simultaneously with this filing of this Cash Collateral Motion, the Debtor will file a *Supplemental Schedule of Affiliates Pursuant to Local Rule 2014-1*, which sets forth the various unsecured loans from the members and relatives of the members of the Debtor.

Plaza in April 2009, right in the middle of the recession. Finally, since April 2009, seven hotels have opened near the Crown Plaza, which led to a decrease in the occupancy rate. On top of these problems, the Hotel was economically damaged as a result of the blow out of the Macondo well operated by British Petroleum.

16. On March 10, 2011, the Louisiana Department of Revenue served the Debtor with a Notice of Levy and/or Garnishment, and seized the Debtor's cash on hand at its Hotel. Accordingly, the Debtor filed for relief under chapter 11.

## RELIEF REQUESTED

17. By this Motion, the Debtor respectfully requests: (a) authorization and approval, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 4001(c)(2), to (i) use cash which may constitute Cash Collateral (as defined below) on an interim basis in accordance with the proposed interim order submitted herewith (the "Proposed Interim Order") and in accordance with the budget attached hereto as Exhibit B (as may be amended, supplemented, modified or extended from time to time with the consent of the Secured Lender or upon approval by the Court, the "Budget") (with respect to the Budget, the Debtor seeks authority (a) to exceed each line item in the Budget by up to twenty percent (20%), so long as the aggregate amount of the Budget on a monthly basis is not exceeded by more than twenty percent (20%), and (b) subject to the foregoing, to use any budgeted amount for expenditures which are not made in a particular monthly period in any other period.), (ii) grant adequate protection liens to the Secured Lender to protect against any diminution in value of the Secured Lender's interest in Cash Collateral to the extent that the lender is entitled to adequate protection under the Bankruptcy Code, subject to the Carve-Out (defined below), (iii) grant an allowed super-priority administrative expense claim to the Secured Lender in the amount of diminution in value of the Secured Lender's interest in Cash

Collateral to the full extent allowed by Section 507(b) of the Bankruptcy Code (the "Superpriority Claims"), subject to the Carve-Out (defined below); (iv) obtain a working capital loan from the members of the Debtor ("Working Capital Lenders") in the amount of $50,000 ("Working Capital Loan"); and (v) pending a final hearing on this Motion (the "Final Hearing"), obtain use of cash which may constitute Cash Collateral (as defined below) on a limited and interim basis to and including the date on which the Final Order is entered; and (b) in accordance with Bankruptcy Rule 4001(b)(2), that this Court schedule the Final Hearing and approve notice with respect thereto, all as more fully described in the Proposed Interim Order.

18. The pre-petition liens and the Superpriority Claims and Adequate Protection Liens granted to the Secured Lender (and any other lender claiming an interest in the Debtor's cash which may constitute Cash Collateral) by this Court should be subject to the right of payment of unpaid fees, expenses and costs (the "Carve-Out"), of the following:

    (a)    Court costs and U.S. Trustee's fees; and

    (b)    $65,000 for bankruptcy counsel and other professionals retained by the Debtor; and

    (c)    $10,000 for any professionals retained by any official committee of unsecured creditors or other similar committee appointed by the Bankruptcy Court.

19. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may use cash collateral with court approval and after notice and a hearing. The Debtor seeks authority to use rents, credit card deposits and proceeds of such deposits (collectively, to the extent such rents, credit card deposits constitute Cash Collateral, the "Cash Collateral")[2], in

---

[2] The Debtor reserve their rights with respect to whether their post-petition revenues constitute cash collateral under 11 U.S.C. § 363(a).

which the Secured Lender may assert a valid and perfected security interest. Pursuant to 11 U.S.C. §363(e), the Court may condition the use of such cash collateral "as is necessary to provide adequate protection of" the interests of the Secured Lender in the Cash Collateral. Pursuant to 11 U.S.C. §361, when a secured party's interest in cash collateral is entitled to adequate protection, such adequate protection may be provided by, among other things, an additional or replacement lien on assets generated post-petition "to the extent that such … use … results in a decrease in value of such entity's interest in the cash collateral."

20. Given that the Secured Lender will assert liens on substantially all of the Debtor's assets, the Debtor proposes to grant the Secured Lender a replacement and continuation lien on post-Petition Date assets having the same respective priority as its prepetition liens, including post-petition rents, accounts receivables and credit card deposits, subject to the Carve-Out, to secure any post-petition diminution in value of cash which may constitute Cash Collateral thereof to the extent such interests are entitled to adequate protection against such diminution under the Bankruptcy Code. The Debtor also proposes to grant the Secured Lender the Superpriority Claims, subject and subordinate only to the Carve-Out as described herein.

21. In addition to the Carve-Out, expenses paid pursuant to the Budget under the Interim and Final Order authorizing the use of Cash Collateral shall, upon payment thereof, be free and clear of any Superpriority Claims and/or Adequate Protection Liens and shall not be subject to recovery by Secured Lender or any Chapter 7 or Chapter 11 trustee or other person or entity on account of any unpaid Superpriority Claims or Adequate Protection Liens.

22. The Debtors do not believe any other creditor asserts a lien on cash which may constitute Cash Collateral; however, to the extent, a party, other than the Secured Lender, asserts a lien on cash which may constitute Cash Collateral, the Debtor proposes to grant that party a

replacement lien on post-Petition Date assets having the same respective priority as its prepetition liens, subject to the Carve-Out and the Adequate Protection Liens and Superpriority Claims granted to the Secured Lender. The Debtor also proposes to grant any other party asserting a lien on cash which may constitute Cash Collateral, a Superpriority Claim, subject and subordinate only to the Superpriority Claims and Adequate Protection Liens granted to the Secured Lender and to the Carve-Out.

## DISCUSSION

**A.    The Need for Use of Cash Collateral**

23.    The Debtor has an immediate need to use Cash Collateral for the purpose of meeting necessary expenses incurred in the ordinary course of its business, paying operating expenses, including payroll, and the costs associated with its restructuring and this proceeding, while it restructures and reorganizes its indebtedness and businesses in a manner that maximizes value and is fair and equitable to all parties in interest.  Further, the expenditure of Cash Collateral is necessary in order to preserve the value of the Collateral.

24.    The Budget provides for the payment of essential ordinary course operating expenses during the Budget period.  Ceasing operations is not in the best interests of any party to this Chapter 11 Case, including the Secured Lender, as the Debtor's failure to operate will immediately and irreparably impair (a) the Debtor's extrinsic value and (b) the Debtor's ability to use Cash Collateral to generate cash proceeds in excess of the amount of the Petition Date Cash Collateral.

25.    The Debtor also seeks the authority to use Cash Collateral to pay the management fees owed to HMC Hospitality Operating Company ("HMC") for March 2010 in the ordinary course of business, and to continue to pay the management fees set forth in the Budget in the

ordinary course of business. The management fees owed for March 2010 are approximately $8,500. The Debtor and HMC entered into a Hotel Management Agreement ("Agreement"), which is an executory contract. Upon assumption of the Agreement, the Debtor would be required to cure the pre-petition claim of HMC. In any event, HMC's services are essential to the uninterrupted function of the Debtor's business operations, and if there were any interruption in HMC's services and, in turn, the operation of the Hotel, the Debtor's reorganization process would be immediately and irreparably harmed. No creditor or party in interest will be harmed by the payment of the portion of the management fees due HMC which is attributable to any pre-petition time period.

26. In addition to the expenses set forth in the Budget, pursuant to Sections 105 and 363(b)(1) of the Bankruptcy Code, the Debtor seeks entry of an order that authorizes, but does not obligate, the Debtor to pay, in its discretion, and in the ordinary course of business, prepetition claims up to $15,000 owing to third parties that are essential to the uninterrupted function of the Debtor's business operations (the "Critical Vendors"). The Critical Vendors include creditors that provide goods and services that keep the Debtor's hotel operational, and without these Critical Vendors, the Debtor's hotel would be forced to close. As a condition to receiving payment, the Critical Vendors must agree to provide postpetition goods and services to the Debtor on the same or more favorable terms and conditions as were in effect prior to the Petition Date (or such other terms as the Debtor determine to be necessary).

27. As a result of the commencement of this chapter 11 case, the Debtor believes that it is possible that some vendors will refuse to continue providing goods and services to the Debtor, or at a minimum, there will be an interruption to the Debtor's business, unless the Debtor is authorized to pay certain of its prepetition claims to the Critical Vendors, and finding

replacement providers for the goods and services identified in this Motion would in some cases, be impossible and for others, an arduous and lengthy task. Accordingly, the Debtor requests the authority to pay these Critical Vendors in its discretion in an amount not to exceed $15,000.

28.     Additionally, to the extent the Budget provides for payment of restructuring costs, including periodic payments to professionals engaged in this chapter 11 case, as long as the Secured Lender is adequately protected, the Debtor's use of the Cash Collateral to pay its professionals is allowed. See In re Proalert, LLC, 314 B.R. 436 (9th Cir. B.A.P. 2004) ("plain language of §363 allows a debtor to use cash collateral [to pay its professionals] if the secured creditor's interest is adequately protected"); In re Coventry Commons Assoc., 149 B.R. 109 (Bankr. E.D. Mich. 1992) (a debtor may use cash collateral to pay professional fees if the secured creditor is adequately protected, without regard to requirements of section 506 of the Bankruptcy Code); In re Tri-County Water Ass'n., Inc., 91 B.R. 547, 550 (Bankr. D.S.D. 1988) (generally, only unencumbered assets may be used to pay administrative claimants, but such claims may be paid from collateral if they resulted in a direct benefit to the secured creditor, if the secured creditor consents or if the secured creditor is adequately protected). As discussed above, the Secured Lender is adequately protected; thus, payment of the Debtor's professional fees and expenses using the Cash Collateral is proper.

29.     Without the use of Cash Collateral on a limited basis as described herein, the Debtor will not be able to pay its employees and other direct operating expenses. Inability to use Cash Collateral on the basis set forth in the Budget would result in an immediate cessation of the ongoing operations of the Debtor's business and would cause irreparable harm to the Debtor's estate. Put simply, the Debtor cannot continue operations and pursue its restructuring efforts absent use of Cash Collateral. For this reason, the Motion is being presented on an emergency

interim basis.

**B.      Proposed Adequate Protection**

30.     The restriction of a debtor's use of cash collateral should only occur where facts show that failure to restrict use may "impair" creditors and deny creditors adequate protection. In re Triplett, 87 B.R. 25, 27 (Bankr. W.D. Tex. 1988).  Whether or not a creditor is adequately protected is determined on a case-by-case basis.  See In re Energy Partners, Inc., 409 B.R. 211, 236 (Bankr. S.D. Tex 2009) (stating that exactly what constitutes adequate protection must be decided on a case by case basis); In re Self, 239 B.R. 877, 881 (Bankr. N.D. Tex. 1999) (determination of adequate protection is not an "exact science"; rather, it requires a court to balance all relevant factors); In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987) (stating that the concept of adequate protection is a flexible one and that courts should determine whether it exists on a case-by-case basis); In re JKJ Chevrolet, Inc., 190 B.R. 542, 545 (Bankr. E.D. Va. 1995) (stating that adequate protection is determined on a case-by-case basis).

31.     Adequate protection exists by virtue of augmentation (or preservation) of the value of a secured creditor's collateral.  See In re Ralar Distribs., Inc., 166 B.R. 3, 6 (Bankr. D. Mass. 1994) ("[a]ctivities of a debtor can enhance collateral value and thereby provide adequate protection"); In re T.H.B. Corp., 85 B.R. 192, 195 (Bankr. D. Mass. 1988) ("[T]he stream of cash collateral will likely remain at an approximate even level over a sustained period, with new proceeds replacing old.  The constant nature of this stream gives the [secured lenders] protection for its cash collateral."); In re Pursuit Athletic Footwear, Inc., 193 B.R. 713, 716-717 (Bankr. D. Del. 1996) (court found secured creditor was adequately protected given lack of evidence that collateral was diminishing, debtor had operated profitably and was projected to continue operating profitably); In re Pine Lake Vill. Apartment Co., 19 B.R. 819 (Bankr. S.D.N.Y. 1982)

(where property which secured mortgagee's claim was experiencing no depreciation and was arguably being enhanced in value and where the value of the property securing the claim was increasing to the extent of unspent rental income being accumulated in segregated cash collateral accounts, mortgagee had adequate protection).

32. As additional adequate protection, the Secured Lender will be granted, effective immediately and without the necessity of the execution by the Debtor of financing statements, mortgages, security agreements, or otherwise, in accordance with section 361(2) of the Bankruptcy Code, replacement and continued security interests in and liens on (the "Adequate Protection Liens") all post-petition Date assets of the Debtor and its estate on which the Secured Lender held valid and perfected liens as of the Petition Date and all proceeds, rents and products of all of the foregoing and all distributions thereon (collectively, the "Post-Petition Collateral"), in the same respective priority it held prior to the Petition Date, and subject to (a) the Carve-Out and (b) valid, perfected, enforceable and nonavoidable liens and security interests granted by law or by the Debtor to any person or entity that were superior in priority to the prepetition security interests and liens held by the Secured Lender, and only to the extent such prepetition senior liens are not otherwise subject to avoidance or subordination, which Adequate Protection Liens are granted to secure the amount of any Superpriority Claim. Notwithstanding the foregoing or anything herein to the contrary, the Post-Petition Collateral shall not include any claims, causes of action and proceeds thereof arising under sections 510, 544, 545, 546, 547, 548, 549, 550 and 551 of the Bankruptcy Code.

33. To protect against any diminution in value to the extent such protection is required by the Bankruptcy Code, the Secured Lender shall also have Superpriority Claims, subject and subordinate only to the Carve-Out.

34. The Debtor asserts that all Cash Collateral now existing and hereafter acquired will be deposited and maintained by the Debtor in certain bank accounts (the "Accounts"), pending disbursement in the ordinary course of business of the Debtor consistent with the provisions of the Proposed Interim Order and the Budget.

35. The Budget includes the Debtor's aggregate projected sources and uses of cash during the Budget period.

**C.   The Working Capital Loan**

36. In order to provide liquidity to the Debtor and ensure its continued operations, the Working Capital Lenders are willing to loan the Debtor the Working Capital Loan. The Working Capital Loan shall bear interest at a rate of twelve (12%) percent per annum and shall include a provision for the payment of reasonable attorney's fees of the holder in the event an attorney is retained for the collection thereof. The Working Capital Loan shall be payable in full on the earliest of: (i) 120 days after the Petition Date, (ii) the effective date of a plan of reorganization, (iii) the entry of an order appointing a trustee or examiner with expanded powers, (iv) the conversion or dismissal of the Debtor's chapter 11 case, or (v) the lifting of the automatic stay with respect to the Property.

37. Pursuant to Sections 503(b)(1)(A) and 507(a)(1)(C), the Debtor requests that the Court grant an administrative priority claim to the Working Capital Lenders in the amount of the Working Capital Loan, plus interest and all legal fees incurred by the Working Capital Lenders ("Working Capital Lenders Claim"). The Debtor further requests that the Court order that the Superpriority Claims of the Secured Lender and any other party asserting a lien on cash which may constitute Cash Collateral shall not be entitled to preference over the Working Capital Lenders Claim.

38. Considering its immediate need for liquidity, the Debtor requests that the Court approve the Working Capital Loan and related relief.

**D.  Interim Approval of the Use of Cash Collateral Should Be Granted.**

39. Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

40. Pursuant to Bankruptcy Rule 4001(b), the Debtor requests that the Court conduct a preliminary expedited hearing on the Motion as soon as practicable (the "Preliminary Hearing") to enter the Proposed Interim Order on the Motion authorizing the Debtor to use Cash Collateral in an aggregate amount not to exceed the amounts set forth in the Budget (other than as described herein) attached to the Proposed Interim Order pending the Final Hearing.

41. The ability of the Debtor to use Cash Collateral for its ongoing operations as it restructures its indebtedness and businesses is in the best interests of the Debtor, its creditors and its estate.  The relief requested herein is necessary in order to avoid immediate and irreparable harm and prejudice to the Debtor's estate and to parties in interest in the Debtor's chapter 11 case.  The Debtor has an urgent and immediate need to use Cash Collateral to continue its business operations while it pursues a restructuring or alternate exit to this Chapter 11 Case.  The Debtor's business will be immediately and irreparably harmed without authorization from the Court to use Cash Collateral, as requested, on an interim basis pending the Final Hearing, and the Debtor's restructuring efforts will be over.

42. The interests of the Secured Lender (and any other lender or creditor who claims

an interest in Cash Collateral) in the Cash Collateral will be adequately protected pursuant to the Proposed Interim Order.  As indicated by the Budget, the Debtor's operations will be cash flow positive during the period covered therein after payment of essential expenses and expenses related to the administration of this chapter 11 case.  Additionally, the value of the Debtor's hard assets will not decline during the Budget period, because the Property will be properly maintained.

43. The terms of the Proposed Interim Order are incorporated herein and made a part hereof by this reference.  Pending the Final Hearing, this Motion should be granted on an interim basis on the terms set forth in the Proposed Interim Order in order to maximize the value of the estates and to prevent irreparable harm to the Debtor prior to the Final Hearing.

## REQUEST FOR FINAL HEARING

44. Finally, pursuant to Bankruptcy Rule 4001(c)(2), the Debtor respectfully requests that this Court set a date for the Final Hearing that is no earlier than fourteen (14) days after service of this Motion and approve the provisions for notice of such Final Hearing that are set forth in the Proposed Interim Order.

45. The Debtor requests that it be authorized to serve a copy of the signed Interim Order, which fixes the time and date for filing objections, if any, by first-class United States Mail upon counsel to the Secured Lender, all other possible secured creditors of record, the Office of the United States Trustee, the Debtor's twenty (20) largest creditors and any party having filed a request to receive service in the Debtor's Chapter 11 Case.  The Debtor requests that the Court consider such notice of the Final Hearing to be sufficient notice under Rule 4001 of the Bankruptcy Rules.

## NOTICE

46. Notice of this pleading has been provided to the following: (i) the United States Trustee; (ii) the Secured Lender and its counsel; (iii) all other possible secured creditors and/or their respective counsel; (iv) the 20 largest unsecured creditors of the Debtor; and (v) all parties who request notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. In light of the nature of the relief requested, the Debtor submits that no further notice is required.

**WHEREFORE**, the Debtor respectfully requests that this Court (a) conduct an emergency hearing on this Motion; (b) enter the Proposed Interim Order substantially in the form submitted herewith; (c) schedule a Final Hearing on the relief requested herein; and (d) grant such further relief as may be equitable and just.

**New Orleans, Louisiana**, this 24th day of March, 2011.

>  */s/ William H. Patrick, III*
> William H. Patrick III, La. Bar No. 10359
> Cherie Dessauer Nobles, La. Bar No. 30476
> **HELLER, DRAPER, HAYDEN,**
> **PATRICK & HORN, L.L.C.**
> 650 Poydras Street, Suite 2500
> New Orleans, LA 70130-6103
> Telephone: 504-299-3300
> Fax: 504-299-3399
> wpatrick@hellerdraper.com
> cnobles@hellerdraper.com
> **Proposed Counsel for Debtor and**
> **Debtor in Possession**